UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARA ACOSTA,<br><br>        Plaintiff,<br><br>  -against-<br><br>THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES, and PAMELA DRYFOOS, individually,<br><br>        Defendants. | **COMPLAINT**<br><br>Civil Case No.: 25-cv-01119<br><br>**JURY TRIAL DEMANDED** |

   Plaintiff Ara Acosta ("Plaintiff"), by and through her attorneys, JOSEPH & NORINSBERG, LLC, as and for her Complaint against The New York Times Company d/b/a The New York Times ("NYT"), and Pamela Dryfoos, individually ("Dryfoos") (collectively, as "Defendants") alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

   1. This is a civil action for damages and equitable relief based upon Defendants' willful violations of Plaintiff's rights guaranteed to her by: (i) the anti-disability discrimination and anti-retaliation provisions of the New York State Human Rights Law ("NYSHRL"); (ii) the anti-disability discrimination and anti-retaliation provisions of the New York City Human Rights Law ("NYCHRL"); (iii) the anti-discrimination and anti-retaliation provisions of the Family and Medical Leave Act ("FMLA"); and (iv) any other violations that can be inferred from the facts set forth herein.

**PRELIMINARY STATEMENT**

2. In an era where corporate accountability and employee rights stand at the forefront of workplace ethics, this case exemplifies the persistent challenges faced by employees who dare to assert their protected rights. Plaintiff, a dedicated Finance Manager at one of the nation's most prestigious media organizations, found herself subjected to a calculated campaign of discrimination and retaliation after exercising her legally protected rights to medical leave and reasonable accommodations.

3. Despite Defendant NYT's public image as a bastion of progressive values and ethical journalism, its internal practices revealed a stark contradiction when confronted with Plaintiff's legitimate medical needs. On February 14, 2024, when Plaintiff tested positive for COVID-19, her supervisor, Defendant Pamela Dryfoos - a member of the family that owns NYT - demanded she continue working despite having a fever and feeling physically unwell, stating "under normal circumstances I would tell you to rest, however, because you are going out of town [on vacation], I need you to work."

4. Defendants' discriminatory and retaliatory conduct escalated when Plaintiff requested time off in July 2024 to attend a family event. Defendant Dryfoos cited Plaintiff's previous COVID-19 diagnosis as justification for denying the request, stating "every time I go out of the office, something happens" and, referring to her COVID-19 diagnosis, stated "something is always happening" with her.

5. The pattern of discrimination reached its apex when Defendant terminated Plaintiff's employment on September 9, 2024, while she was on approved FMLA and short-term disability leave - merely weeks after and in direct response to her raising concerns about retaliation to Defendant NYT's Human Resources department. Despite Defendants' claim that Plaintiff's

position was being eliminated due to organizational restructuring, Defendant immediately thereafter sought to hire her replacement, explaining to a candidate that he cannot start the job now because "it was cause legal trouble," but that the position would be available once the issue was resolved.

6. This case serves not only to vindicate Plaintiff's rights but also to shed light on the critical importance of enforcing workplace protections, particularly in an institution that purports to champion social justice while failing to uphold these principles within its own walls. Through this action, Plaintiff seeks to hold Defendants accountable for their discriminatory practices and to ensure that other employees are not subjected to similar treatment for exercising their legally protected rights.

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. §2000(e), et seq. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

8. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

9. At all relevant times, Plaintiff worked for Defendants in New York and was an "employee" entitled to protection as defined by the NYSHRL, the NYCHRL, and the FMLA.

10. Defendant NYT is a New York corporation with its principal place of business located in New York, New York.

11. Defendant Dryfoos is a New York resident who was and is at all times Plaintiff's direct supervisor, and therefore was and is a "person" and "employer" within the meaning of the NYSHRL, and NYCHRL.

12. At all relevant times herein, Defendant employs fifteen or more employees and is thus an "employer" within the meaning of the NYSHRL, the NYCHRL, and the FMLA.

## BACKGROUND FACTS

### *A Promising Career Cut Short by Discrimination*

13. In May 2023, Plaintiff began her employment with Defendant NYT as a Finance Manager for "The Athletic," an online publication and subsidiary of the NYT.

14. Plaintiff's initial employment agreement stipulated a term from May 15, 2023, to September 15, 2023, and a salary of $135,000 per year.

15. On September 15, 2023, Plaintiff entered into a new employment agreement extending her role as Administrative Director until September 15, 2024, with an increased salary of $155,000 per year and eligibility for a bonus of up to $10,000.

16. Plaintiff's role was crucial in overseeing advertising revenue and expenses for The Athletic.

17. Her position was unique, as she managed The Athletic's financials separately from primary NYT operations, providing transparency to investors and ensuring a profitable revenue stream in what was then a new endeavor.

### *The First Signs of Discriminatory Treatment*

18. On February 13, 2024, at 8:24 AM, Plaintiff informed Ms. Dryfoos via Slack that she had woken up with a fever and would be working from home while awaiting COVID-19 test results.

19. Ms. Dryfoos responded at 10:30 AM stating "feel better, Ara! we have no childcare today due to the weather so i'll be WFH and in and out a bit."

20. The following day, on February 14, 2024, at 11:48 AM, Plaintiff notified Ms. Dryfoos via Slack that she had tested positive for COVID-19, stating she was "incredibly stressed out" and needed to rest.

21. Another colleague, Wendy Espe, responded with concern, asking "Can you get to the dr for some kind of med? that will make it not as long."

22. Despite Plaintiff's illness, during a Google Meets conversation at approximately 1:00-1:30 PM on February 14, 2024, Ms. Dryfoos -- who is a member of the Ochs-Sulzberger family which has owned and published the NYT since 1869 -- insisted that Plaintiff continue working.

23. When Plaintiff informed Ms. Dryfoos that she had a bad fever and sore throat, Ms. Dryfoos stated, "**_under normal circumstances I would tell you to rest, however, because you are going out of town I need you to work_**."

24. This reference to Plaintiff "going out of town" referred to upcoming approved and planned time off that Plaintiff was anticipating in the following weeks.

25. Following this conversation, one of Plaintiff's colleagues messaged her stating _"i can't believe they're making you work while you're sick..... that's so inhumane"_ and advised that Ms. Dryfoos should have directed her to report to Occupational Health per NYT company protocol.

26. The colleague further noted that Plaintiff was "entitled to covid sick days" and described Ms. Dryfoos as a "fucking nepo baby."

27. At 4:12 PM on February 14, 2024, Plaintiff emailed Mr. Cooperhouse, senior manager within NYT's Occupational Health division, requesting assistance regarding her COVID-19 diagnosis.

28. At 10:47 PM that same day, Plaintiff sent a follow-up email explaining Ms. Dryfoos's unlawful demand that she continued working despite having "a fever and throbbing headache."

29. Mr. Cooperhouse responded at 8:02 PM approving Plaintiff's use of COVID-19 quarantine days and advising she could return to the office on February 20th after convalescing and once she tested negative.

### *Escalating Pattern of Discrimination*

30. Plaintiff's appropriate and lawful decision to advocate on her own behalf to take COVID-19 sick leave by acting contrary to Defendant Dryfoos's unlawful directed proved to be the beginning of the end of Plaintiff's employment, as Defendants - - through Dryfoos - - embarked on an increasingly hostile campaign of discrimination and retaliation culminating in the unlawful termination of Plaintiff's employment.

31. On June 13, 2024, at approximately 4:17 PM, Plaintiff approached Ms. Dryfoos at her cubicle to request time off in November for an upcoming family event. Plaintiff explained she hoped to take 7-8 days off while ensuring her Tuesday deliverable due at or around that timeframe would be completed by working remotely.

32. Ms. Dryfoos responded dismissively, stating "I don't know, that seems like a long time to be out of office. I need to consult with Jen, Lynda, Wendy, and HR to see if this is okay." Ms. Dryfoos emphasized it was a "really critical time in the business" and she needed Plaintiff to support the team.

33. On July 11, 2024, at approximately 1:45 PM in conference room 06-E2-242, Plaintiff met with Ms. Dryfoos to revisit her time-off request.

34. During this meeting, Plaintiff explained she hadn't seen her family in 10 years, her cousin was getting married, and her father was turning 70. Ms. Dryfoos offered Plaintiff a window from November 20th to December 4th, but when Plaintiff requested slight adjustments to accommodate travel time to Malaysia's countryside, Ms. Dryfoos refused, stating she was "being generous" and had "consulted with everyone and HR."

35. During this same meeting, Ms. Dryfoos cited previously unidentified "performance issues" and Plaintiff's prior COVID-19 illness and protected leave as justification for denying the request, stating "every time I go out of the office, something happens" and "you came back from [leave] and had other personal matters going on which impacted the April forecast. I don't really feel comfortable letting you go."

36. When Plaintiff protested that contracting COVID-19 was beyond her control, Ms. Dryfoos responded, "I know COVID isn't your fault, but still. Something is always happening."

## *Manufactured Performance Concerns*

37. On July 19, 2024, at 1:06 PM, Plaintiff met with Ms. Dryfoos via Google Meets to discuss her confusion and concern over what Ms. Dryfoos had - - for the very first time - - identified as the sudden emergence of performance concerns.

38. Plaintiff expressed shock that their previous conversation about PTO had led to an unsubstantiated discussion about her performance, emphasizing that she thoroughly enjoyed her job and working with everyone on the team, and only meant to perform to the utmost level.

39. During this meeting, Ms. Dryfoos admitted that her prior response was fabricated, stating that she "***will take responsibility for not being as transparent as I should have been over***

*the last couple months*" **regarding any performance issues**, acknowledging that she had never before identified any performance issues with Plaintiff - - neither with herself nor with other managers without Plaintiff's knowledge.

40. Ms. Dryfoos outlined three areas of concern: analytical skills, workload management, and questioning Plaintiff's commitment to her role.

41. However, when Plaintiff asked for specific examples of appearing uncommitted to her work, Ms. Dryfoos responded, "You know, I think, ah that's a good question and I should have thought about that a little bit more and come prepared," once again demonstrating pretext covering up her developing plan to manufacture justification to later terminate Plaintiff's employment.

42. Indeed, as before, the only example Ms. Dryfoos could provide was Plaintiff's request for time off, stating "pushing to take time off when it's a bad time when I think it will hurt the team."

## *Protected Activity and Swift Retaliation*

43. Following their July 19, 2024, meeting, Ms. Dryfoos never identified any other so-called "performance issues" with Plaintiff.

44. Plaintiff attempted to keep her proverbial "head down" while focusing on her work, attempting to avoid Ms. Dryfoos retaliatory animus amidst her growing fear that her job was in jeopardy.

45. But things took a turn for the worse on August 7, 2024, when Plaintiff informed Ms. Dryfoos that her grandmother was in hospice care and that she might need to travel to California as a result.

46. The following day, at 7:37 AM, Plaintiff began reaching out to HR to identify the appropriate contact person to discuss her potential need for FMLA leave.

47. On August 9, 2024, at 7:03 AM, Plaintiff sent an urgent email to Ms. Garcia within NYT's HR department, stating that her request was "pertaining to family leave I need to take ***and my concern for retaliation from my director.*** I am currently in route to JFK to catch a flight to San Francisco to see my grandma who was admitted into hospice care yesterday."

48. Ms. Garcia responded with sympathy and provided New York Paid Family Leave forms, noting the leave would provide "up to 12 weeks of leave paid at 68% of your average weekly wage."

49. She also acknowledged Plaintiff's retaliation concerns but suggested focusing on family matters first, stating "[a]s for the concern regarding potential retaliation we can absolutely talk about that but I firmly believe it should wait and you should be with [your grandmother] now."

50. On August 12, 2024, at approximately 11:00 AM, Plaintiff met with Ms. Garcia to discuss her leave request and concerns about retaliation.

51. During this meeting, Plaintiff detailed the previous incidents, including Ms. Dryfoos's COVID-19 rebuke and manufactured performance concerns. Plaintiff explained she had been discouraged from reporting issues with Ms. Dryfoos previously due to Ms. Dryfoos's family connection to the Company, as several coworkers expressed a well-known fear of retaliation for speaking out against Ms. Dryfoos given her power within the NYT organization.

52. Ms. Garcia assured Plaintiff she would address the issue with the legal team and advised Plaintiff to take bereavement leave and consider short-term disability if needed.

53. On August 22, 2024, Plaintiff requested short-term disability leave due to mental health distress from her grandmother's passing.

54. Her short-term disability and FMLA leave were approved from August 26, 2024, through November 18, 2024.

*<u>The Ultimate Act of Retaliation</u>*

55. But Defendants' unlawful conduct was undeterred by Plaintiff's personal loss and legally protected complaint and leave.

56. On September 7, 2024, at 1:30 PM, while Plaintiff was on approved leave, Ms. Garcia emailed Plaintiff requesting a meeting for September 9, 2024, at 9:00 AM.

57. During this Google Meets conversation, Ms. Garcia informed Plaintiff that her position was being eliminated, stating "the team has been rolling out changes to simplify how they operate, reduce layers of management and streamline the work" and that "the amount of work available for the athletic is less than we imagined."

58. During this termination meeting, Plaintiff expressed concern about the timing, noting it came shortly after her HR complaint about retaliation.

59. Ms. Garcia attempted to dismiss these concerns, claiming the organizational changes were "underway prior to that" and that Plaintiff was "not the only person impacted in finance."

60. However, when Plaintiff pressed further about experiencing discrimination and "extreme microaggressions," Ms. Garcia deflected, suggesting Plaintiff "take a beat" and "sit with what you just got told," minimizing and ignoring Plaintiff's good faith and legitimate concerns of discrimination and retaliation.

61. Around noon that same day, Plaintiff's colleagues informed her that their managers had pulled them aside to discuss Plaintiff's termination, specifically telling them "***to not worry because [Plaintiff's] role was the only one eliminated and they were safe***," directly contradicting Ms. Garcia's misrepresentation to Plaintiff.

62. Just three days later, on September 12, 2024, at approximately 4:00 PM, Plaintiff learned that Ms. Dryfoos had inquired about hiring a contractor to help support the team as Plaintiff's replacement -- effectively seeking to replace Plaintiff while claiming her position had been eliminated.

63. This inquiry was made in front of other employees, with Ms. Dryfoos asking an administrator how to proceed with hiring a contractor.

64. Thereafter, on October 7, 2024, Plaintiff made a complaint to Defendants, through counsel, demonstrating her unlawful treatment and Dryfoos's obvious retaliation.

65. Immediately thereafter, evidence of Dryfoos's attempt to hire a contractor disappeared from NYT's electronic records.

66. But Dryfoos's efforts to hire Plaintiff's replacement continued. Specifically, Dryfoos solicited another NYT employee to inquire if they would consider moving from NYT's finance department to the finance team within The Athletic. In so doing, Ms. Dryfoos explained that they could not be hired "right now" because it was cause "legal issues" - - an obvious reference to Plaintiff's ongoing claims - - but promised that once the legal issues "died down," they would be able to join The Athletic's team within the year.

67. This amounts to Dryfoos's obvious attempt to cover up her retaliatory decision to terminate Plaintiff's employment by shrouding her efforts to hire Plaintiff's replacement until a time long enough from Plaintiff's complaints to appear to break chain of events demonstrating her unlawful behavior.

68. Throughout her employment, Plaintiff demonstrated exceptional dedication to her role, often going above and beyond her duties by assisting with social media, attending board meetings and social events, and accepting meetings from numerous parties beyond her regular

work hours. She consistently showed initiative in improving processes, working closely with the advertising team to clean up pipeline data and maintain transparency in financial reporting but none of that mattered when Plaintiff had the gumption to stand up to Dryfoos's unlawful and unprofessional conduct.

69. Defendants' unlawful acts of discrimination and retaliation, culminating in her wrongful termination, caused Plaintiff to suffer, and continue to suffer, monetary and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANT NYT
*(Disability Discrimination in Violation of the NYSHRL)*

70. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

71. Defendants, through Dryfoos and others, discriminated against Plaintiff in violation of the NYSHRL by subjecting Plaintiff to a hostile work environment due to her disability and failing to provide reasonable accommodations.

72. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which she is entitled to an award of monetary damages.

73. As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Retaliation in Violation of the NYSHRL)*

74. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

75. Plaintiff engaged in protected activity under the NYSHRL by requesting reasonable accommodations for her disabilities and complaining to HR about discrimination.

76. Defendants, through Dryfoos and others, retaliated against Plaintiff for engaging in protected activity by manufacturing performance concerns, subjecting her to increased scrutiny, and ultimately terminating her employment.

77. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which she is entitled to an award of monetary damages.

78. As a direct and proximate result of Defendants' conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Disability Discrimination in Violation of the NYCHRL)*

79. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

80. Defendants, through Dryfoos and others, discriminated against Plaintiff in violation of the NYCHRL by subjecting Plaintiff to a hostile work environment due to her disability and failing to provide reasonable accommodations.

81. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
*(Retaliation in Violation of the NYCHRL)*

82. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

83. Plaintiff engaged in protected activity under the NYCHRL by requesting reasonable accommodations for her disabilities and complaining to HR about discrimination.

84. Defendants retaliated against Plaintiff for engaging in protected activity by manufacturing performance concerns, subjecting her to increased scrutiny, and ultimately terminating her employment.

85. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered economic losses, and continues to suffer such losses, for which she is entitled to an award of monetary damages.

86. As a direct and proximate result of Defendants' conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## **FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
*(Interference and Retaliation in Violation of the FMLA)*

87. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

88. At all relevant times, Plaintiff was an eligible employee under the FMLA, having been employed by Defendant for at least 12 months.

89. Defendants are both an employer covered by the FMLA, in that NYT employs 50 or more employees within a 75-mile radius of Plaintiff's worksite, and in that Defendant Dryfoos had and exercised the power to hire and fire Plaintiff and control the terms and conditions of her employment as it related to her FMLA leave and rights under the FMLA.

90. Plaintiff suffered from serious health conditions, including COVID-19 and mental health distress, which required continuing treatment by healthcare providers.

91. Plaintiff provided notice to Defendants of her need for FMLA-qualifying leave by informing Defendants of her medical conditions and need for leave.

92. Defendants interfered with Plaintiff's FMLA rights by failing to inform her of her eligibility for FMLA leave during her COVID-19 illness, failing to designate her leave as FMLA-protected, and failing to provide her with required notices regarding her FMLA rights.

93. Defendants retaliated against Plaintiff for exercising her FMLA rights by manufacturing performance concerns after her COVID-19 leave, using her medical leave as justification for denying subsequent time off requests, and ultimately terminating her employment while on approved FMLA leave.

94. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she seeks an award of monetary damages and other relief.

95.     Defendants' unlawful actions display willfulness and malice, entitling Plaintiff to an award of liquidated damages under the FMLA.

## JURY DEMAND

96.     Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.     A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State laws;

b.     Preliminary and permanent injunctions against Defendants and NYT's officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

d.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

e.     An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

f.     An award of punitive damages;

  g. An award of liquidated damages pursuant to the FMLA;

  h. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

  i. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
    February 7, 2025

                     Respectfully submitted,

                     **JOSEPH & NORINSBERG, LLC**

              By: _/s/ Michael R. Minkoff_
                     JON L. NORINSBERG, ESQ.
                     MICHAEL R. MINKOFF, ESQ.
                     110 East 59th Street, Suite 2300
                     New York, New York 10022
                     Tel.: (212) 227-5700
                     Fax: (212) 656-1889
                     _Attorneys for Plaintiff_